THE CENTRAL BRANCH UNION PACIFIC RAILROAD COM-
PANY v. MARCUS HARDENBROOK.

OCCUPYING-CLAIMANT ACT; *Prima Facie Title in Claimant, to Appear
from the]Whole of the Records of Public Office.* Under that provision of
the occupying-claimant law which extends the benefits thereof to any
person "being in the quiet possession of any lands or tenements, for which
such person can show a plain and connected title in law or equity, derived
from the records of some public office," (Laws of 1873, p. 203,) the whole
of the records of any public office, to which the occupying claimant him-
self appeals as furnishing evidence of his title to the land in controversy,
may be taken into consideration so far as such records can in any manner
affect the title to such land; and in order to enable him to get the benefit
of said provision of the occupying-claimant law, such records should show,
*prima facie* at least, that at the time he made the improvements on the
land he had an interest therein, and that such interest was of that high
character which may properly and rightfully be denominated in law or
equity a title. No interest less than an apparent title would be suffi-
cient; and this apparent title must be manifest from a consideration of
the whole of the records of the public office to which the occupying
claimant refers, so far as such records apply to the case.

*Error from Marshall District Court.*

ON June 24, 1875, the defendant in error, *Marcus Harden-
brook,* commenced an action in the district court of Marshall
county against the plaintiff in error, *The Central Branch
Union Pacific Railroad Company,* and Ralph M. Pomeroy,
Effingham H. Nichols and Henry Day, to compel them to
convey to him the northwest quarter of section 21, in town-
ship 1, of range 8, east of the sixth principal meridian, in
said county of Marshall, on certain grounds set forth in the
petition filed in the action.

The defendants in the court below demurred to said peti-
tion, but the same being overruled, they took leave to an-
swer. On September 25, 1875, the defendants in the court
below filed their answer, and on November 8, 1875, the
plaintiff in the court below filed his reply.. On December
21, 1875, a stipulation was filed, whereby the defendants R.
M. Pomeroy, E. H. Nichols and Henry Day disclaimed any

interest in said land, leaving the controversy to be determined between said *Marcus Hardenbrook* and the *Railroad Company* only. On December 21 and 22, 1875, the cause came on to be heard before the court, a jury being waived; and the court made special findings of all the facts in said cause, and also its conclusions of law thereon, and rendered judgment accordingly, in favor of said *Railroad Company*, fully confirming and quieting its title to said land, and adjudging that the said *Marcus Hardenbrook* had no title to nor right of possession of said premises, either legal or equitable, but that the entire estate therein, both legal and equitable, and the right of possession thereof, were vested in said *Railroad Company*. But thereupon the said *Marcus Hardenbrook* filed his motion for the benefit of the occupying-claimant act, on the ground that he was entitled thereto *on the findings of fact* in said case; and said motion coming on immediately for hearing, the same was sustained, to which ruling and decision the said *Railroad Company* then and there excepted. The findings of fact and conclusions of law appear in the record, and are as follows:

(*Court, and Title.*) This cause coming on to be heard at the December term, 1875, of this court, to wit, on the 21st of December, 1875, and being submitted to the court on the pleadings and the evidence, the court doth find therefrom the following facts, being all the facts in said case, to wit:

1st. The said Central Branch Union Pacific railroad company (formerly known as the Atchison & Pike's Peak railroad company) is a corporation duly organized and existing under the laws of the state of Kansas, and is the assignee of the Hannibal & St. Joseph railroad company of all the rights of the said H. & St. J. R. R. Co. under the act of congress entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific ocean, and to secure to the government the use of the same for postal, military, and other purposes," approved July 1, 1862, and an act of congress amendatory thereof, approved July 2, 1864; said acts being commonly known as the Pacific railroad acts.

2d. On March 6, 1866, said C. B. U. P. R. R. Co. (then known as the A. & P. P. R. R. Co.) filed in the office of the secretary of the interior a map or plat, showing the definite

location of the route of said railroad from Atchison, on the Missouri river, in a general westerly direction, to the west line of section 9, in township 5, south, of range 8, east of the sixth principal meridian, in Marshall county, Kansas, showing the route of said railroad in said county of Marshall to be as follows, to wit: In range 10, east of the sixth principal meridian, through sections 12, 11, 10, 9, 8, 7 and 18, in township 4; range 9, east of the sixth principal meridian, through sections 13, 14, 15, 16, 17, 20, 19 and 30, in township 4; range 8, east of the sixth principal meridian, through sections 36 and 35, in township 4, south, and through sections 2, 3, 4, 9, and into section 8, in township 5, south; the route of the road from said section 17, in township 4, south, of range 9, east, to the terminal point, being nearly in a southwest course. Said railroad was completed to said terminal point according to said route of permanent location, sometime during the year 1867. Said map, filed in the office of the secretary of the interior, was duly verified by Franklin Fanning, chief engineer of said railroad, February 18, 1866, and showed the surveys of lands in Kansas, from the Missouri river, westward to and including range 4, east of the sixth principal meridian, and from the Nebraska state line south to and beyond the second standard parallel, and including the land in controversy.

3d. On March 8, 1866, the secretary of the interior addressed a communication to the commissioner of the general land office, informing him of the filing of said map or plat, and transmitting the same to him, and ordering said commissioner of the general land office to withdraw the lands opposite to the route of said railroad, agreeably to law.

4th. On March 15, 1866, the commissioner of the general land office addressed a communication to the register and receiver of the land office at Junction City, Kansas, (in which district the land in controversy was situate,) said communication inclosing a map or diagram of the route of said railroad in said land district, and showing by a large, heavy yellow line the twenty-mile limit of the lands of said railroad company, which diagram was taken from and was a copy of the original aforesaid; and said register and receiver were ordered "to withhold from sale or location, preëmption or homestead, all odd-numbered sections within said limits." The land in controversy was included within the limits of said withdrawal, the northern line of said withdrawal extending one and one-half sections north of the north line of

said land in controversy. But counting directly north from said section 9, in township 5, south, range 8, east, (the terminal point aforesaid,) twenty-one sections intervene between said section 9 and the section in which the land in controversy is situated, and the distance from the route of said railroad at said terminal point to the land in controversy is about twenty-two miles (according to the government survey of sections); but the land in controversy is only eighteen miles (according to the government survey of sections) from the route of said railroad, as shown by said plat at section 17, in township 4, south, range 9, east. The lines of said withdrawal from the Missouri river westward are drawn twenty miles from said route on each side thereof, according to a line extended at right angles across said route, and according to said rule the land in controversy is about eighteen miles from the line of said railroad.

5th. Said communication from the commissioner of the general land office, and said diagram inclosed therewith, were received by the register and receiver at Junction City, Kansas, on March 24, 1866, and the register immediately marked the township plats in the land office by a large, heavy blue line, corresponding in all respects with the yellow line of said transmitted map, to show the limits of said withdrawal. By the said blue line it appeared that the land in controversy was one and a half miles within said withdrawal limits. On March 26, 1866, the then register, Geo. W. Martin, acknowledged by letter addressed to the commissioner of the general land office the receipt of said communication and diagram from said commissioner, and stated therein that the township plats were marked accordingly.

6th. Said railroad having been completed on said route and duly accepted by the government commissioners, (as well as a further extension of the same to Waterville,) a patent for the land in controversy, with a large amount of other lands, was executed by the president and delivered to said railroad company July 26, 1872, a copy of which patent (omitting the description of all lands except those in controversy) is annexed to defendant's answer, as exhibit A.

7th. On June 1, 1867, the plaintiff, Marcus Hardenbrook, filed his declaratory statement, No. 1986, for entry of said land under the preëmption acts of congress. The said Marcus Hardenbrook was then and ever since has been the head of a family and a citizen of the United States, and had never before enjoyed the privilege of preëmpting any part of the

public land, and was not the proprietor of 320 acres of land, and did not quit or abandon his own land to reside on the public land. The said Marcus Hardenbrook plowed about twelve acres of said land in the month of June, 1867, and afterward, during the same summer, cut and put up some prairie hay thereon; and on August 9, 1867, the said Marcus Hardenbrook applied to enter said land under the homestead act of congress and paid the fees therefor, and received from James R. McClure, then register, the duplicate certificate set up as exhibit A, and from S. D. Houston, then receiver, the receipt set up as exhibit B, (to plaintiff's petition,) and the said Marcus Hardenbrook paid the office fees therefor, $14. The said register and receiver issued said papers through mistake or inadvertence, not calling to mind that said land had been reserved and withdrawn in favor of said railroad company.

8th. The said Marcus Hardenbrook built a house on said land, commencing the same in the latter part of September, or in October, 1867; and on December 12 moved into the same with his family, and has ever since resided therein with his family. Said house is 19x22 feet in size, and one and one-half stories high, with two floors; and during his residence on said land he has broken about sixty acres and cultivated the same, set out some hedge fence, which has mostly died out, has dug a good well, erected a stable and a corn crib, sheds and a cattle corral, and has set out about 250 forest trees; said improvements being worth in all about $700.

9th. On August 2, 1869, the said homestead entry of said Marcus Hardenbrook (2119) was canceled by order of the commissioner of the general land office, for the reason that the same was erroneously allowed upon land previously withdrawn (March 26, 1866) for the benefit of said railroad company; and the register and receiver at Junction City were at said time advised of said cancellation, ordered to note the same on their records, and to notify the said Marcus Hardenbrook of said cancellation. Notice was immediately transmitted by mail, and said notice was received by said Marcus Hardenbrook by due course of mail.

10th. The said Marcus Hardenbrook took no measures to have said proceedings reviewed, either at the land office or in the department of the interior, except to address a letter to the commissioner of the general land office, to which the commissioner replied that the land belonged to the railroad company. But about February 27, 1873, the said Marcus

Hardenbrook went with two witnesses to the land office at Concordia, (in which district said land was then situate,) and offered to prove up his settlement and cultivation of said land according to the provisions of the homestead act of congress; but the register and receiver refused to hear proof thereof, on the ground that said homestead entry had been canceled as aforesaid, and the land patented to said C. B. U. P. R. R. Co.

11th. The said Marcus Hardenbrook made a portion of his said improvements after receiving notice that his homestead entry was canceled, and that said land belonged to said railroad company. He has kept possession of said premises ever since 1867, and still remains in possession without leave or authority from the defendants or either of them.

12th. The said railroad company conveyed said premises to the defendants, R. M. Pomeroy, E. H. Nichols, and Henry Day, and the deed was recorded in Marshall county, but subsequently the said R. M. Pomeroy, E. H. Nichols and Henry Day reconveyed said premises to said railroad company, which deed has not been recorded; and by written stipulation on file in this case, the said R. M. Pomeroy, E. H. Nichols and Henry Day disclaim any title to said premises, leaving the controversy to be settled between the plaintiff and the said railroad company, defendant.

13th. The said railroad is not now, and never has been, completed so as to connect and unite with the road through Kansas, as provided for in the 13th section of said act of congress of July 1, 1862, and that the road through Kansas changed their route and built their road under the provisions of an amendatory act of July 3, 1866, so as to connect with the Union Pacific railroad at a point not more than fifty miles westerly from the meridian of Denver, in Colorado, instead of connecting at the 100th meridian west of Greenwich, as provided for in the original act of July 1, 1862.

From the foregoing facts, the court doth find the following conclusions of law:

1st. The plaintiff, Marcus Hardenbrook, has no title, legal or equitable, to the said premises described in his petition.

2d. The said C. B. U. P. R. R. Co., defendant, is the full owner of said premises in fee simple, both at law and in equity.

3d. At the commencement of this action, the plaintiff did, and he now does, unlawfully hold possession of said premises, and he then did, and now does, unlawfully keep the said

defendant, the C. B. U. P. R. R. Co., out of the possession of the same.

4th. The plaintiff is not entitled to the relief prayed for in his petition.

5th. The defendant, the C. B. U. P. R. R. Co., is entitled to the immediate possession of said premises, and to a decree quieting the title as against the claim of the plaintiff, and for costs of suit.

The *Railroad Company* avers that the order of the court allowing the said Hardenbrook the benefit of the occupying-claimant law is erroneous, and therefore it brings the case here for review.

*D. Martin*, for plaintiff in error :

The plaintiff, Hardenbrook, fell short in several particulars of showing "a plain and connected title in law or equity derived from the records of some public office."

1. He neither alleged nor proved facts sufficient to show that he was a legal or qualified homesteader under the act then in force. (12 U. S. Stat. at Large, 392, §1; 2 Brightly's Dig. 396, §50.)

2. The claim of the plaintiff below to the land on which he resides, never rose to the dignity of a color of title, either in law or equity. Even if the railroad company had failed to build its road, still he would have had no vested right to the land capable of enforcement, for it had been previously withdrawn in accordance with the acts of congress; and this may lawfully be done even after occupation and improvement under the preëmption acts. (*Frisbie v. Whitney*, 9 Wall. 187; *Western Pacific R. R. Co. v. Tevis*, 41 Cal. 489.)

3. If the land had never been withdrawn from preëmption and settlement under the homestead act, yet the plaintiff below would have had no title either legal or equitable; for in order to obtain even an equitable title, the settler must reside upon and cultivate the land at least five years, while in this case he was officially informed of the cancellation of his entry only two years after the same was made. (12 U. S. Stat. at Large, 392, §2.)

4. Even if it were admitted that the plaintiff below obtained a color of title, either legal or equitable, it was not "a plain and connected title." *Jay v. Granby Mining Co.*, 15 Kas. 171, 173. But in the case at bar, the plaintiff below did not show *any* conveyance to him, much less a "*succession of conveyances.*" The only written evidences of right which he presents are those attached to his petition, showing his homestead entry; and they do not purport to convey any property whatever. They are in no way "connected with the legal and unquestioned title." This court, in construing the Pacific railroad acts in *K. P. Rly. Co. v. M. K. & T. R. R. Co.* 15 Kas. 15, 20, says: "It is probable that title passed upon the permanent location of plaintiff's road adjacent to these lands." This is undoubtedly the law. (12 U. S. Stat. at Large, 492, 493, 495, §§ 3, 4, 7, 13; 13 id. 358, 359, §§ 4, 5, 6; *Railroad Co. v. Fremont Co.*, 9 Wall. 89, 94; *Fenwick v. Gill*, 38 Mo. 510.) After the withdrawal, and without restoration, no preëmption or homestead right could attach to the land withdrawn. (*Stoddard v. Chambers*, 2 How. 284, 317, 318.)

5. If the homestead papers could be regarded as constituting a conveyance, still the plaintiff did not show "a plain and connected title in law or equity, *derived from the records of some public office.*" He exhibited his homestead papers, but did not pretend to prove that the records of the office at Junction City (or at Concordia) showed a plain and connected title in him. Those records *did* show that for more than a year before this mistaken entry was made, the land had belonged to the railroad company, or had been withdrawn in its favor. Everything had been done by the railroad company and by the government, which the law required or authorized to be done, to give notice of the claim and title of the railroad company to this land; and the company was in no way responsible for the subsequent mistake of the register and receiver, and should not be prejudiced thereby. (*King v. Potter*, 18 Mich. 134, 143.)

6. The benefits of occupying-claimant acts are not to be extended to cases not expressly within their terms; and

the case of the defendant in error is not within the terms of our act. (*Waldron v. Woodcock*, 15 Ohio, 13; *King v. Potter*, 18 Mich. 134; *King v. Harrington*, id. 213, 217.)

We suppose that in a proceeding to obtain compensation for improvements, the occupying claimant cannot dispute or relitigate the title of the party from whom he claims compensation, that matter having become *res adjudicata.* (*Thompson v. Gilman*, 17 Vt. 109.)

It is a general rule that a person in possession of land, with notice of an adverse claim, is not entitled to the value of his improvements upon a subsequent eviction by such adverse claimant. *Scroggs v. Taylor*, 1 A. K. Marsh. (Ky.) 247; *Harrison v. Baker*, 5 Litt. (Ky.) 250; *Harrison v. Fleming*, 7 T. B. Mon. (Ky.) 537; *McKim v. Moody*, 1 Rand. (Va.) 58.

*J. D. Brumbaugh,* for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: The only question presented for our consideration in this case is, whether or not the defendant in error, Marcus Hardenbrook, is entitled to the benefit of any of the provisions of the occupying-claimant law. We must answer this question in the negative. The only portion of said law under which the defendant claims any right, is that portion which extends the benefit thereof to any person "being in quiet possession of any lands or tenements for which such person can show a plain and connected title in law or equity, derived from the records of some public office." (Code, § 601; Laws of 1873, p. 203.) The defendant fails to bring himself within the foregoing provision in certain important particulars. 1. He not only fails to "show a *plain and connected title* in law or equity" to the land in controversy, but he fails to show *any title*, plain or otherwise. He does not even show an apparent title. Indeed, he does not claim, and has never claimed, to have any title to the land in controversy, but merely claims to have been a *bona fide* occupant of the land under the act of congress providing for homestead

settlements.  2. But, whatever his right or interest in the land may be, it cannot be called "a plain and connected title," "*derived from the records* of some public office;" for, although the public records of the U. S. land office at Junction City show what his rights and interests in the land are and were, yet they do not show that he has "derived" any right or interest of any kind from such records. On the contrary, they show that he has not "derived" any right or interest from such records. They show that long before the defendant occupied the land, or made any claim thereto, it was withdrawn from sale, and from preëmption, and from homestead settlement, and that it was set apart for the benefit of the plaintiff, under the acts of congress of 1862 and 1864, giving lands to aid in the construction of its railroad and telegraph line. And the said records, showing this withdrawal and setting apart of said land, were and are clear, certain and unambiguous. There was no room for any mistake to be made with reference thereto. 3. The defendant does not show that he has the legal qualifications to make a homestead settlement; but from what is shown, probably it should be presumed that he has such qualifications.

Under the above-quoted provision of the occupying-claimant law, we think the whole of the records of any public office to which the occupying claimant himself appeals, as furnishing evidence of his title to the land in controversy, may be taken into consideration so far as such records can in any manner affect the title to such land; and that, to enable him to get the benefit of said provision of the occupying-claimant law, such records should show, *prima facie* at least, that at the time he made the improvements on the land he had an interest therein, and that such interest was of that high character which may properly and rightfully be denominated in law or equity a title. No interest less than an apparent title would be sufficient; and this apparent title must be manifest from a consideration of the whole of the records of the public office to which the occupying claimant himself refers, so far as such records apply to the case. Of course, if the rec-

29—21 KAS.

ords should show an apparent title or a *prima facie* title, that would be sufficient, however defective and worthless the title might *in fact* be.

At the time the defendant made his said settlement, the title to the land in controversy was in the United States. The plaintiff had some conditional and inchoate equities therein, which were then ripening and afterward ripened into a complete and absolute title, and the defendant had nothing and got nothing by his settlement; and the records themselves upon which the defendant now relies clearly showed at all times this condition of affairs.

The judgment of the court below giving to the defendant in error, plaintiff below, the benefit of the occupying-claimant law will be reversed, and cause remanded with the order that judgment be rendered on the special findings in accordance with this opinion.

All the Justices concurring.